IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CARMEN TALAVERA, by and through her Next Friend, JACOB PRADO GONZALEZ, Consul of Mexico,

Plaintiff,

v.

JAMES WILEY, D.O., et al.,

Defendants.

Case No. 11-2440-JWL

**MEMORANDUM AND ORDER**

This medical malpractice case presently comes before the Court on the various motions by defendants for summary judgment (Doc. ## 35, 39, 42, 44, 46, 48). The Court agrees with defendants that plaintiff has failed to establish the requisite causation to support her claims of malpractice. Accordingly, the Court **grants** the motions, and defendants are awarded summary judgment on plaintiff's claims in their entirety.

## I. Facts[1]

After a fall at a store, plaintiff arrived by ambulance at the emergency room of the Southwest Medical Center in Liberal, Kansas, at 11:11 p.m. on November 9, 2007.

[1]In accordance with the applicable summary judgment standard, these facts are undisputed or related in the light most favorable to plaintiff, the non-moving party.

Defendant James Wiley was the on-call doctor at the emergency room. Plaintiff left the emergency room at 12:10 a.m. on November 10, 2007, without having been seen by Dr. Wiley or any other physician. Plaintiff returned to the emergency room at 2:06 a.m. on November 10, and was subsequently examined by Dr. Wiley. A CT scan was taken of plaintiff's head, and plaintiff was discharged and left the hospital at 5:49 a.m. The CT scan was interpreted by defendant Assadollah Zainali (a physician with defendant A. Zainali, M.D., Radiology, P.A.) later that day. Plaintiff was taken back to the emergency room by ambulance at 3:30 p.m. on November 10, and she was subsequently examined by defendant Kathryn Phyfer, the on-duty emergency room physician. Plaintiff was ordered discharged, but she did not leave the hospital premises. Later that evening, by orders of Dr. Phyfer and Dr. Wiley, she was transferred to the hospital psychiatric ward, where she was placed under the care of defendant Robert McIntyre, a psychiatrist. Plaintiff's care was later transferred to defendant Lionel Benoit-Rock, a psychiatrist, who first examined plaintiff on November 12, 2007. On November 14, 2007, plaintiff underwent an MRI, which revealed a cerebral infarction, or stroke.

After her stroke was diagnosed, plaintiff was transferred to the Intensive Care Unit under the care of an internal medicine physician (Dr. Sharon Mitchell, not named as a defendant). On November 16, 2007, plaintiff was transferred to a hospital in Wichita, and a hemicraniectomy was performed on plaintiff that day by a neurosurgeon (Dr. Nazih Moufarrij, not named as a defendant). Plaintiff now alleges that she suffers from brain damage and paralysis, and she has brought medical malpractice claims

against Dr. Wiley, Dr. Zainali (and his professional association), Dr. Phyfer, Dr. McIntyre, and Dr. Benoit-Rock.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon the pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III. Analysis

### *A. Causation*

Plaintiff generally alleges that each defendant committed malpractice by failing to diagnose and treat her stroke. Defendants argue that summary judgment is appropriate because plaintiff has failed to provide evidence, in the form of expert opinion, to establish the requisite causation. "A claim of medical malpractice is based on actionable negligence and requires the same elements of proof as required in any negligence

action." *Sharples v. Roberts*, 249 Kan. 286, 294 (1991).[2] The plaintiff thus bears the burden of proving that the allegedly negligent act caused injury. *See id.* at 295. In this case, plaintiff does not dispute—and the Court agrees—that she must establish causation through expert testimony. *See id.* ("Expert medical testimony is ordinarily required to establish a causal connection between plaintiff's injuries and the defendant's negligence."); *Watkins v. McAllister*, 30 Kan. App. 2d 1255, 1258 (2002) (exception to requirement of expert medical testimony arises only where "the existence of causation is apparent to the average layman from common knowledge or experience") (citing *Hare v. Wendler*, 263 Kan. 434, 440, 442 (1997)).

To establish causation, plaintiff relies only on the expert opinions of Dr. Cathy Helgason, a neurologist, who proffered general opinions that defendants' negligence caused injury to plaintiff. When Dr. Helgason elaborated in her deposition testimony, however, her expert opinions were shown to be insufficient to establish the requisite causation here.

In her testimony, Dr. Helgason discussed two possible treatments that, in her

[2]The parties agree that plaintiff's malpractice claims are governed by Kansas law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (forum state's choice-of-law rules determine which state's substantive law applies); *Ling v. Jan's Liquors*, 237 Kan. 629, 634-35 (1985) (in Kansas, tort claims are governed by the law of the state in which the tort occurred).

opinion, could have been administered to plaintiff if her stroke had been diagnosed earlier. The first such treatment is thrombolytic therapy, referred to by the parties and Dr. Helgason as "tPA" (tissue plasminogen activator). The parties have stipulated, and Dr. Helgason confirmed in her testimony, that under the applicable standard of care in 2007, the window of time for the administration of tPA therapy was three hours from the onset of symptoms, which means that in this case, plaintiff would not have been a candidate for this therapy after 1:30 a.m. on November 10, 2007. Thus, Dr. Helgason conceded that this potential treatment would only be relevant to a claim against Dr. Wiley arising out of plaintiff's first visit to the emergency room, and would not factor into her causation opinion with respect to any alleged failure after that time.

With respect to that first visit by plaintiff to the emergency room, Dr. Helgason could only testify that if a stroke had been diagnosed, plaintiff would have been a *potential* candidate for tPA therapy, as certain requirements would have to have been met. For instance, plaintiff would have needed a negative scan (unlike the scan that was later taken of plaintiff) and a lack of recent trauma to or bumps on the head (despite plaintiff's fall at the store). Dr. Helgason conceded that she could not say within a reasonable degree of medical probability that plaintiff would have qualified to receive tPA therapy prior to 1:30 a.m. on November 10, 2007. Therefore, Dr. Helgason was unable to offer an expert opinion that, more likely than not, plaintiff would have received tPA therapy if a stroke had been diagnosed earlier. Without such causation testimony, plaintiff may not base her claim against any defendant on her failure to receive such

therapy.[3]

Dr. Helgason also testified about her opinion that, if a stroke had been diagnosed earlier, plaintiff would have been placed under the care of a neurologist and monitored, and she could have received the hemicraniectomy surgery before she actually received it on November 16, 2007. Dr. Helgason conceded, however, that she would defer to a neurosurgeon on the timing of when such surgery should actually be performed. Dr. Helgason also testified that she did not believe this surgery would have been performed on November 10 if a stroke had been diagnosed, and she stated that the care given to her by Dr. Mitchell between the time the stroke was actually diagnosed and the surgery was actually performed (a delay of more than a day) was appropriate. Dr. Helgason ultimately opined that plaintiff would have been transferred to intensive care if the stroke had been diagnosed sooner, but she could not state any opinion as to when the surgery would have been performed after an earlier diagnosis. Thus, Dr. Helgason could not offer any expert opinion that the delay in the diagnosis actually affected the time that plaintiff received the surgery.

Moreover, Dr. Helgason conceded that she could not say that any particular medical problem for plaintiff resulted from or was worsened by edema (swelling addressed by this surgery) and did not result from the initial stroke. Thus, even if Dr.

[3]In light of this ruling, the Court need not rule on Dr. Wiley's alternative argument that, with respect to plaintiff's first visit to the emergency room, no physician-patient relationship was formed and thus no legal duty to plaintiff arose at that time.

Helgason had testified that the surgery would have been performed sooner with an earlier diagnosis, she could not testify that the delay resulted in any particular harm to plaintiff.

Accordingly, Dr. Helgason was unable to offer an expert opinion that plaintiff suffered any particular injury from the delay in the diagnosis of a stroke. Without such expert testimony, plaintiff cannot establish the requisite causation, and defendants are entitled to summary judgment. *See Sharples*, 249 Kan. at 296-97 (evidence insufficient to establish causation as a matter of law where expert could only state that it was possible that some injury might have been avoided if a kidney stone had been discovered sooner, without a "firm conclusion" either way).[4]

*B. Loss of Chance*

Plaintiff has also alleged that defendants' malpractice caused her to suffer a loss of chance of a better recovery. For instance, plaintiff's claim could perhaps be expressed

[4]Plaintiff's claim against defendant A. Zainali, M.D., Radiology, P.A. is based solely on the theory that the defendant is vicariously liable for the negligence of its employee, defendant Assadollah Zainali. The defendant organization argues that K.S.A. § 40-3403(h) precludes a medical malpractice claim based on vicarious liability. The Court agrees that that statute generally abrogates vicarious liability of health care providers under certain circumstances. *See Sharples*, 249 Kan. at 289. Defendant, however, has not provided any evidence or otherwise shown that both it and the individual defendant were qualified for coverage under the Health Care Stabilization Fund addressed by that statute. *See* K.S.A. § 40-3403(h); *cf. Treaster v. HealthSouth Corp.*, 442 F. Supp. 2d 1171, 1185 (D. Kan. 2006) (Lungstrum, J.) (granting summary judgment to health care facility on vicarious liability claim based on affidavit establishing that both the facility and the individual qualified for Fund coverage). Accordingly, the Court does not grant summary judgment to the defendant organization on this alternative basis.

as one alleging that the delay in her diagnosis resulted in a lesser chance that she might be able to benefit from tPA therapy or an ealier surgery. Defendants are entitled to summary judgment on any such claim as well, however, because Dr. Helgason's opinions are not sufficient to allow a jury to determine damages based on that theory.

In *Delaney v. Cade*, 255 Kan. 199 (1994), the Kansas Supreme Court recognized a cause of action for loss of a chance of a better recovery. *See id.* at 202-11. Because the gravamen of such a claim is negligence, the plaintiff must still establish the usual elements of negligence, including causation. *See id.* at 202-03, 215. The court adopted the middle, "relaxed" standard of proof for the claim, under which a plaintiff must prove a substantial loss of the chance for survival or better recovery (as opposed to showing merely any loss of the chance). *See id.* at 215.

Defendants argue that *Delaney* requires an expert to express the loss of chance in terms of a percentage for the jury, while plaintiff argues that she must only meet the "substantial loss of chance" standard. In *Delaney*, the court refused to draw any bright line setting the particular percentage of lost chance that is necessary to satisfy the "substantial loss" standard. *See id.* at 215-16. The court proceeded, however, to adopt the proportional damage approach for loss of chance claims, by which "the amount recoverable equals the total sum of damages ordinarily recovered for the underlying injury multiplied by the percent of lost chance." *See id.* at 218. The court reasoned: "Because this method requires expert medical testimony in ascertaining the appropriate (percent) amount of damages recoverable, courts employing this method eliminate the

risks of compensating plaintiff for anything other than the value of the lost chance." *See id.* The court further endorsed the following reasoning by a federal court applying this method of determining damages under Kansas law:

> This method is preferable because it apportions damages in direct relation to the harm caused; it neither overcompensates plaintiffs or unfairly burdens defendant with unattributable fault. Second, the percentage method gives juries and judges concrete guidelines on how to measure damages, alleviating the 'pulling out of the hat' problem identified with [another] method. If the decision maker believes plaintiff's expert(s) on causation, the percentage of chance lost, then it makes the usual finding on the value of a life ($X) and multiplies $X by the percentage of chance lost to arrive at the compensation for the lost chance to survive.

*See id.* (quoting *Boody v. United States*, 706 F. Supp. 1458, 1465-66 (D. Kan. 1989)).

The Court concludes that, under *Delaney*, a plaintiff must offer expert testimony that expresses the lost chance as a percentage, in order to guide the jury's determination of damages. In *Delaney*, the court stated that expert testimony is required in "ascertaining" the appropriate percentage, and it agreed with the federal court's method by which the trier of fact could believe the plaintiff's expert on the percentage of chance lost. If no such testimony concerning a percentage were required, then the jury would be forced to perform the kind of "pulling out of a hat" in arriving at a percentage that the *Delaney* court clearly wished to avoid. *See also Finney v. City of Wellington*, 2010 WL 1253647, at *4 (Kan. Ct. App. Mar. 26, 2010) (unpub. op.) (because loss of chance must be expressed as a percentage to guide the calculation of damages, expert opinion was insufficient to avoid summary judgment in part because it did not establish a percentage of the loss of chance).

In this case, Dr. Helgason's expert testimony is not sufficient to support a claim for loss of chance of a better recovery. First, causation of injury to plaintiff must still be shown, and, as discussed above, Dr. Helgason's testimony does not establish the requisite causation here. Second, Dr. Helgason did not provide the requisite guidance concerning how damages may be calculated in this case. Dr. Helgason testified that up to 58 percent of patients may benefit from tPA therapy. She could not state, however, that plaintiff would have qualified for such therapy. Nor did she attempt to estimate the likelihood that plaintiff would have qualified. Moreover, Dr. Helgason admitted that she could not state how much improvement plaintiff would have experienced if she had benefitted from such therapy. Therefore, a jury could not rely on Dr. Helgason's testimony for any guidance calculating damages or determining the percentage of lost chance that plaintiff would have received and benefitted from tPA therapy. Likewise, Dr. Helgason could not state the opinion that plaintiff would have received an earlier surgery if she had been diagnosed earlier, and she deferred to the judgment of surgeons on any issue of the timing of the surgery. Dr. Helgason also could not state that earlier surgery would have avoided any particular injury to plaintiff. Dr. Helgason certainly did not attempt to estimate the likelihood that plaintiff would have received and benefitted from an earlier surgery if her stroke had been diagnosed earlier. Thus, Dr. Helgason's testimony provides no guidance for the jury in resolving that issue.

In this case, the jury would not have the requisite expert guidance and thus would be forced, inappropriately, to "pull figures out of a hat" in determining damages if a lost

chance claim were submitted to it. Accordingly, defendants are also entitled to summary judgment if plaintiff's claims are considered as lost chance claims.

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' motions for summary judgment (Doc. ## 35, 39, 42, 44, 46, 48) are **granted**, and defendants are awarded summary judgment on plaintiff's claims in their entirety.

IT IS SO ORDERED.

Dated this 12th day of April, 2012, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge